Good morning. May it please the Court in opposing counsel, I'm here on behalf of Jerry Coles. My name is Sharon Nelson. Jerry Coles is the appellant in this case. There are two issues that are primarily before this Court, and one is whether the lower district court improperly granted summary judgment with respect to the claim against the union, and the second issue is whether the court improperly granted summary judgment with respect to the company. We obviously disagree with the lower court's opinions on both of those issues, and I'd like to start by talking about why we disagree with the court's decision with respect to the union. The union was sued for a breach of fair duty of representation, and one of the allegations and one of the arguments presented to the lower district court is based on the evidence that was presented, the union had performed a rather perfunctory investigation, if indeed it was a sufficient investigation at all. Based on the holding in Wellman v. Riders Guild, the argument was made to the lower district court that when a union engages in a perfunctory investigation of a meritorious grievance, that is a ministerial action. When you have a ministerial action by a union, you then can focus on whether or not the union's conduct was arbitrary, in bad faith, or discriminatory. The lower --" Ginsburg. I'm going to ask you what you say was inadequate. It's true the union didn't interview everybody, but the union did interview every person who actually witnessed the relevant events. Why isn't this sufficient for the requirement of a minimal investigation, which is all that is required under Castelli? Because, Judge Nelson, the union did not interview everyone who actually witnessed the events. What the union argued to the lower district court was that there were two interviews of Mr. Coles himself, one during the grievance intake process and one at the Board of Adjustment. But that's not what the record demonstrated. What the record demonstrated is that Mr. Coles, when he filled out the grievance sheet, which is in the record at 091, he attached a written statement to that grievance sheet saying what happened. There was no interview of Mr. Coles at that time. Then the union tried to argue, well, we did interview him at the Board of Adjustment, and they categorized the Board of Adjustment as a meeting, almost like an investigatory meeting. But when you look at the collective bargaining agreement itself, when it talks about the Board of Adjustment at record 00060, the Board of Adjustment is categorized as a hearing, not an investigatory meeting. And at the hearing of the Board of Adjustment, there are company representatives and both parties meet to confer and talk about evidence. Mr. Coles' testimony was taken at that hearing, but he was never interviewed by the union at that hearing. So in fact, Mr. Coles was indeed not interviewed by the union at all. The same can be said of Ms. Connell-Carrasco, who had several different versions of events about what took place. But once again, the union had to rely on its argument that the Board of Adjustment is actually an investigatory meeting when it is not, and had to admit that Ms. Connell-Carrasco was only interviewed or testified at the Board of Adjustment. So at no time were the two people that were directly involved actually interviewed by the union. That is one of the primary concerns we had with the lower court's ruling. The other primary concern, though, stems from the fact that the lower court failed to investigate pertinent witnesses, even if they weren't eyewitnesses. The union just decided that Ms. Puente, who they believed was Mr. Coles' girlfriend, would support him, so they decided not to interview her. Mr. Coles, in his written statement that's provided in the record at 0092, detailed witnesses who would support his version of events. They refused to interview those individuals as well. Nancy Hanegar was one of those individuals, and it was important to interview her because she was involved with Ms. Connell-Carrasco's changing of her story. Yes, but wasn't that all deemed to be hearsay? No, no. The meeting between Nancy Hanegar and Ms. Connell-Carrasco was not hearsay. But what was revealed at that meeting would amount to hearsay. What was revealed at that meeting is Ms. Connell-Carrasco dictated a statement to Ms. Hanegar saying, I lied. Actually, Mr. Coles didn't direct me to leave during work hours and go pick up this individual, and I'm now recanting that testimony. And Ms. Connell-Carrasco signed off on that statement, submitted it to the company, and it was also submitted to the union. And then what happened after that with respect to that statement? Well, the statement was completely disregarded by the union. They determined that Ms. Connell-Carrasco, based on her representation during her testimony at the Board of Adjustment, that she must have been intimidated by Mr. Coles, and that's why she changed her statement. And she did, in fact, recant that statement another time. She did recant it. Yes, she did. Thank you. The district court, when granting summary judgment, made the determination that it didn't even have to look at whether the union's conduct was arbitrary because the district court didn't consider the fact that the investigation was perfunctory, thereby lending itself to a ministerial action on the part of the union. And once the district court made that determination, it said whether the union's conduct is arbitrary or not is not even relevant to the court and didn't discuss it. And it should have. Based on the authority that was cited to the district court, there certainly was evidence that there was a perfunctory investigation, and certainly whether or not the union acted arbitrarily should have been addressed by the district court. And it simply was not. The argument that witnesses were not properly interviewed leads us right into the Tenorio case, which I understand is a case that this Court was extremely concerned about having far-reaching effects. So I think the last sentence of that case specifically says the Tenorio case is fact-specific to this case. But the facts of Tenorio mirror almost exactly those of Mr. Coles. The one difference in Tenorio is that there were cards, travel cards that were issued to the union members immediately, and that was not an issue with respect to Mr. Coles. But in Tenorio, the union failed to interview the people who were involved in the grievance and also failed to interview witnesses identified by the people involved in the agreement, in the grievance. Tenorio also, the union failed to make any extra effort with respect to the discharged employees. And the Ninth Circuit specifically commented on that and said there's nothing in this record to show that the union made any further effort that they should have made when you have a discharged employee versus an employee who's simply disciplined or who has been suspended. So for all of those reasons, we believe that the district court improperly granted summary judgment with respect to the union, and we would ask that this court send it back to the district court for further determinations on that issue or for a trial in front of Mr. Coles' peers. Moving to the company, I understand that preemption is a tough nut to crack, and I realize I have an uphill battle here, but we forge ahead and we're going to try to do that here today. So one of the things that we argued at the lower district court level that the district court level did not find particularly persuasive was that although this collective bargaining agreement does grant the right for just cause termination, so it vitiates the at-will status of the employee and actually elevates the status of the employee to only a just cause termination situation, that aside from granting that right, the collective bargaining agreement did nothing else. There was no definition of just cause. There was language in the collective bargaining agreement that specifically identified egregious behavior for which immediate termination could follow from, but just cause itself was not defined. And one of the things that we argued to the lower district court is, for example, in the Miller v. AT&T case, if you don't have any relevant provision in the collective bargaining agreement, you can't possibly have contradictory interpretations of the law. And the whole issue of preemption, the whole goal of preemption, is to make sure that we decrease any inconsistencies with respect to collective bargaining agreements and their interpretation. But in this case, because the collective bargaining agreement was so deficient in the terminology that it used --" Scalia. Almost all collective bargaining agreements say just cause. I'm sorry? I said almost all collective bargaining agreements say just cause. They do. They do. And one of the things the Supreme Court talked about in the Lingle case was just because the collective bargaining agreement confers a right on the employee, it doesn't mean that the collective bargaining agreement controls everything and the court has to automatically grant exemption. And that is true. Preemption applies when there's such an incestuous intertwining of the terms that the court would be required to go to the collective bargaining agreement and actually interpret that agreement. And that wasn't the case in this situation. Lingle actually talks about, for example, the collective bargaining agreements historically across the country set things like benefits, the amount of pay, the time away from work. Things like that are dictated by collective bargaining agreements. But when you have an employee sue that has to deal with damages issues related to the rate of pay, courts can still go to the collective bargaining agreement, pull that right that's granted by the collective bargaining agreement, but still address the causes of action with relation to a failure to pay because it's not collective bargaining agreement doesn't mean that the terms require that the court go in and interpret the collective bargaining agreement. So those were the arguments that we made to the lower court that we felt should have precluded summary judgment, and I would like to reserve the rest of my time unless I have further questions from the panel on rebuttal since I have two opposing counsel to deal with. Please. Good morning. Kristen Martin representing Culinary Workers Union Local 226. I'm splitting appellees' time with Aramark's counsel, who's our co-defendant in this case. Counsel has conceived, I think, that there's no evidence that the union's decision not to submit Jerry Cole's grievance to arbitration was made in bad faith or with a discriminatory motive. The sole argument before this Court is whether the union's processing of that grievance was arbitrary. And I'll respond to the points that counsel made about whether this union's processing of the grievance was arbitrary. First of all, there's no duty, there's no per se duty to interview every witness or grievance in person. And I refer the Court to the Fristo and the Eichelberger cases, which involve that exact set of facts, where the union representative reviewed written statements from the grievance but didn't actually interview them in person, dismissed the grievance, and the Court said that's fine, there's no duty of fair representation violation. Secondly, as far as the facts, the facts are that the Coles was spoken to about the facts of this case on two different occasions by representatives of the union. The first occasion was when he filed his grievance with the union. He spoke with the person in the position of grievance intakes, whose job it is to meet with the people, the workers, to come in to file grievance. And on page ER, I'll get it to the Court, there's the grievance form. And the grievance form is signed by Coles, and his written statement he brought with him was attached to it, but the form itself was filled out by Linda Agassiz. And we have Coles's testimony at his deposition that he did not fill out the text of this form which explains why he was terminated and the circumstances. That was the first occasion when someone from the union spoke with Mr. Coles about the circumstances that led to his termination. The second occasion was at the board of adjustment meeting, and that is this union's policy. It uses the board of adjustments to gather the facts. It asks questions of all the witnesses that come to that meeting. It asks questions of the management witnesses. It asks questions of the grievant. It asks questions of any witnesses the grievant brings. And it then reserves the right to or asks for more information if it feels like there are more witnesses out there that it didn't interview at that meeting. And there's no case that says that's an improper procedure. That somehow violates the duty of fair representation. Well, it may well not. I wouldn't say it's the best way if you're interviewing a witness who's on your side. You normally want to talk to them alone and find out the story, not in front of the opposing counsel. Well, the union does not use the board of adjustment as an adversary process. That's the way they say that. Now, that may not be proper for the truth. No, but it may turn into an adversary process if you're going to pursue an arbitration or a grievance. You'd like to collect the information, I would think, from your member, not bring in a management representative and quiz him in front of management. Well, let me say you can't do that. I'm just saying I find it a rather odd way to get information from your members to get it in front of management or the employer. Well, and maybe that's why there's the first step in the grievance process where the grievant has to come down to the union hall, has to meet with the grievant intake person and provide details of the stories to that person. We have testimony then that Philip Christman, who handled this grievance, reviewed That's not quite the same as having your, whatever you call them, specialist who's ultimately going to represent your member in an arbitration with the management being the opposing side. I would think you'd want to, and this may have nothing to do with the outcome of the case, but I think it's an odd way for, if a lawyer's investigating a case where he's defending someone, you know, he goes out and interviews his witnesses. He doesn't go to the, bring along the prosecutor. You may think that's not a good analogy, but. I mean, that's what I was going to say is the law is very clear. The union representatives aren't held to the same standard as lawyers would be held to. But it is an adversary proceeding ultimately if you decide to go ahead with the arbitration. That is correct. The arbitration itself would be an adversary proceeding, but the union has a policy of not trying to hide facts. It wants all the facts to come out so that the cases that have merit are the ones that are submitted to arbitration. Yeah. I understand. I'm just saying you might want to reconsider that policy. I'll let my client know. Yes. A few further responses to comments made by Plaintiff's counsel regarding the statement of Dolores Cano Carrasco, who is the employee that was sent to pick up Coles's girlfriend. She did not recant, quote, unquote, a second time. The facts are, and here's what we have in that record about what she said about what she did on March 18th. When she got the warning notice from her employer, she told the employer's representatives that Coles sent her to pick up Alma Puente. When she filed the grievance, she told the grievance intake person that Coles sent her to pick up Alma Puente, and she had a written statement she had written to that effect. Then she was called to Nancy Henniger's house and wrote a statement with Nancy Henniger's assistants saying, I did it on my own, Coles had nothing to do with that. Then she did not take that statement and give it to anybody. She went and talked to Eric Korngluth, who's a manager of Aramark, who's the person who gave her the warning and said, look, I wrote this statement in Nancy Henniger's house, but it's false. Then at the board of adjustment meeting again, she said Jerry Coles told her to pick up Alma Puente. And at her deposition, she testified that Jerry Coles told her to pick up Alma Puente. Now, there is a point in the deposition testimony that's a little bit confusing, because English is not her first language. Since you read that testimony, it's very, very clear that she has trouble communicating. So there is a point at which something becomes confused, but I'd refer the Court, if there's any concern about what she said in deposition, to page 289 of the excerpts of record. The only thing that was done with the ---- and this, I think, was a question that was asked by the Court. The only thing that was done by the statement that Cano Carrasco wrote at Nancy Henniger's house was a statement by Jerry Coles. Jerry Coles took that statement and brought it to the union when he filed his grievance over his termination. And then the last point I would make is regarding the Tenorio case, it does not mirror the facts of this case. There was a conflict of interest by the union. In that case, the grievant had gotten in trouble for, gotten fired for getting in a fight with the union officials. There is no such conflict of interest in this case. Unless the Court has any further questions, I'll let my co-counsel. Thank you, Your Honor. Rob Dodson, for Aramark Sports and Entertainment. I would, I guess, open by suggesting that Judge Reinhart is exactly correct. This is clearly a preemption case. This is a case that involves a clause of just cause, and if you are to argue whether it's inside or outside of the collective bargaining agreement, the interpretation of just cause, the general effect of such a ruling would be to undermine collective bargaining agreements and most collective bargaining agreements throughout this country. And that clearly is not the intention of preemption. The idea is that we control and we support the concept of collective bargaining agreements as the most efficient way for organized labor and management to work together and avoid unnecessary litigation. In this case, it is clear that all of the claims that have been brought by the plaintiff arise solely and exclusively from the collective bargaining agreement. It's clear that the process of the collective bargaining agreement was followed. It's clear that Aramark had no additional independent or separate agreement, contract, or obligation to Coles. Thus, we would contend that summary judgment, as granted, was appropriate and consistent with the Labor Management Relations Act, Section 301. With regard to the good faith and fair dealing, similarly, it comes exclusively from the collective bargaining agreement. There's no other separate contract from which such an obligation could arise, and therefore, it is inexorably intertwined with an interpretation. Well, Posey counsel didn't mention a claim for emotional distress, but why would the collective bargaining agreement relate to that claim? I'd be happy to discuss that, Judge Nelson. Again, there's a possibility under a certain facts of circumstances that are not present here that there could be an independent claim under State law for intentional infliction of emotional distress. Here, however, if you look at Appellant's brief, he cites to the actions of the investigation of Aramark, the interviewing of the employees, and exclusively to the termination and, frankly, the circumstances surrounding the grievance process that arises, again, solely from the collective bargaining agreement. Also, there's a nuance in Nevada law that in the intentional infliction of emotional distress claim, where there's actually no physical impact or injury, there must be a physical or outward evidence of the emotional distress, and that is also absent in the record here. I don't recall if Judge Hunt actually addressed that. I think his ruling relies entirely on the preemption argument as well, but that was something that we argued below, and I would point that out to you, Your Honor. Thank you. The lastly, I guess, is the issue of this has not been brought as a 301 hybrid case, but that's the preemption issue, and if the union is found to have fairly represented, then certainly, even had this been a case, we're out of this action. But similarly, even if there's a finding of fair or an adverse finding by this Court regarding fair representation, we would still contend, or I would contend on behalf of Deremerk, that the summary judgment below was appropriate, because preemption was clearly found, as all the claims arise from, the collective bargaining agreement. Unfortunately, I seem to have four minutes, and my counsel might have used the time better. I don't know if there's any additional questions for me. Don't appear to be any. All right. Thank you. Thank you. I do want to talk more briefly again about the Sonorio case, because it does apply. And one of the things that we argued to the lower district court that was just summarily rejected, and I'm not sure if it was based on a credibility determination by the lower district court or what the motivation for it was, but there were policies and procedures that we elicited evidence about with respect to this union about how investigations were to be conducted. Those policies and procedures were not followed with respect to Mr. Coles. We had sworn testimony from Bea Duran, who is a grievance specialist, who indicated that every single witness was supposed to be interviewed. Well, I thought that what she said was that was the way she did it. When I talked to her in her deposition, she indicated that was the policy. Her understanding was that every single witness was supposed to be interviewed. And she represented that as the union's policy. She also represented as the union's policy that if during the course of interviewing every single witness, more information was elicited or more witnesses were identified, it was the union's obligation to follow up on those witnesses. She also testified that during the course of the investigation, if the union deemed that certain witnesses were supposed to be brought to the Board of Adjustment hearing, it was the union's obligation to do that. And with respect to Mr. Coles, none of that was done. So in addition to the other arguments that were made regarding Tenorio, including the failure to investigate and the failure to handle Mr. Coles' termination with extra care, this union also did not follow its own policies and procedures with respect to how to handle a grievance. Regarding the union's policy, it was not true that Mr. Bonaventure, the union's director of legal affairs, testified that the union had no policy requiring every witness to be interviewed? No. What happened was all of these individuals were deposed during the course of litigation and after the close of discovery, each of them submitted affidavits expanding on their testimony or in some cases changing that testimony that were attached to the motion for summary judgment. So those affidavits were first provided at the motion for summary judgment stage, but they were not provided during the course of deposition. And B. Durand's testimony before the affidavits were submitted was uncontested. There was no other witness that came out and said this is not our policy and this is not our procedure. The cases seem to require only a minimal investigation by the union regardless of what she said about the policy. A minimal investigation, Judge Nelson, does, however, require that it still be fair and reasoned, and when a union chooses to only interview the witnesses that the company provides and fails to follow its own policies and procedures and interview the people that were impacted by the decision or directly involved in the event, that is not a minimal investigation. That is not fair and reasoned. With respect to the IAED claim, the Court actually did not move past the preemption issue on that. What Nevada does not require is physical manifestation of emotional distress. It does require some level of treatment, and we did present evidence that Mr. Coles had been undergoing treatment with respect to his emotional distress claim. And I will submit on that. Thank you for your time. Thank you. The case just argued is submitted, and we'll hear the last case for argument, which is Rund v. Charterfield case.
judges: Schroeder, Nelson, Reinhardt